GRIFFIN, C.J.
This is an appeal of a jury verdict rendered in favor of Jason Williams [“Williams”], the plaintiff below, in an action for negligence.
On August 4, 1993, Williams and Phillip Ryan Maloney [“Maloney”] were involved in a one-car automobile accident in Williams’ Camaro. There were no eyewitnesses to the accident, and both Williams and Maloney claimed that the other was the driver of the vehicle when the accident occurred. Both Williams and Maloney were minors at the time of the accident, and there is evidence that the two had been drinking.
Williams brought the instant action against Maloney on January 26, 1995 to recover damages for the injuries he sustained in the accident.[1] Maloney then filed a third-party complaint against Su Kwak, who owned Shop-N-Go, which was a convenience store at which Williams, and possibly Maloney, purchased beer on the night of the accident.
At trial, both Williams and Maloney reiterated the assertion that the other was driving when the accident took place. Williams, the plaintiff, testified that he had purchased two quarts of beer early in the evening for himself. He said it was possible that he had also purchased beer for the others, but he thought that someone else might have come in with him. He claimed that Maloney was “drinking the entire night” and “keeping up pretty well.” They stopped to get more beer before going out to the Mill, which is a nightclub on Kirk-man Road in Orlando. Williams may have bought beer for both of them. They arrived at the Mill sometime around 10:00 or 10:30 p.m. They hung around in the parking lot, still drinking beer, with Williams drinking about a six-pack. He claimed that towards the end of the evening his head began to spin and he knew he had *417 had too much to drink. He said he opened the passenger door and sat down and leaned his head back. He recalled being aware that his head was hanging out the door and they were pulling out of the Mill, with Maloney driving. The next thing he remembered was coming to in the hospital.
Additional evidence presented during Williams’ case in chief established that Williams’ Camaro struck a concrete light, pole. The impact occurred on the passenger side, near the “B” post, where the rear window is located. Williams was apparently thrown into the windshield on impact, and then rebounded back against the seat. The vehicle appeared to have had a high-speed impact, due to the damage sustained by the vehicle.
Ellen Earley, the first paramedic/firefighter to arrive on the scene, testified that Maloney approached her when she arrived and said that Williams was still in the vehicle. Maloney may also have said that Williams was the driver of the vehicle. Paramedics ascertained that Maloney had relatively minor injuries, with his primary complaint being neck and back injuries.[2]
Earley then went to check on Williams. He was found wedged into the passenger seat of the vehicle. He had his head over the back of the seat in an unnatural position. He was angled toward the passenger door, with his bottom in the seat, but with his feet up on the console in front of the gear shift in a “fetal” position. The soles of his feet were facing the driver’s door. The entire right side of his scalp had been removed by the accident, and a piece of scalp with hair on it was hanging from the windshield on the passenger side. His baseball cap was stuck in the windshield on the same side.
Much of the testimony presented during Williams’ case in chief concerned the issue of damages. Williams’ stepfather, Charles Stephens, testified that Williams was in the hospital for 35 days.[3] This appears to have included the time he spent in a “BIRC” unit (“Brain Injury Rehabilitation Center”), which is a rehabilitative unit in which he had to relearn the most basic activities, such as tying his shoes. It was seven weeks before he was able to take care of himself. Even then, he had limitations, such as irritability, memory loss, and sensitivity to light. Stephens said that before the incident he and Williams’ mother had never had any significant problems with Williams. After the accident, he would do things such as mow only half of the lawn and think he was through. He has also become very irritable and now has a “very short fuse.” Additionally, he has pain twenty-four hours a day and his neck tenses so much that tears come to his eyes. On cross-examination, Stephens was asked whether Dr. Cole had made any treatment recommendations to Williams, such as surgery. Stephens said that he had not. Stephens acknowledged that Williams was essentially discharged from Dr. Cole’s care on December 18, 1994 and that he has gone to see him only two or three times since his discharge, with one visit taking place the week before trial, at which he complained of neck and back pain. He also admitted that Williams had not been to see Dr. Victor Robert, his neurologist, in five years.
Williams’ mother, Karen Stephens, testified that prior to the accident Williams had a “really good attitude” and was more than willing to do his chores. Since the accident, he has “balked” at helping out. He gets “aggravated over just little things” and sometimes forgets things. One night she saw him get “really upset” and she could not even understand what he was saying. She found his behavior very “strange.” He also has concentration and memory problems almost daily. Addition *418 ally, he has headaches and back or neck pain.
At the close of the plaintiffs case, Williams’ attorney acknowledged that he was not seeking any damages for loss of future earning capacity. However, he indicated that he was seeking damages for “cognitive” or personality problems allegedly caused by the accident. Defense counsel sought to preclude Williams’ attorney from arguing to the jury that Williams had suffered brain damage due to the accident. He contended that the sole evidence on this issue was lay evidence, which would not support a finding that Williams had sustained any permanent brain injury. The court reserved ruling on the issue until the close of the evidence.
The defense was based in large part on Maloney’s testimony, which was that Williams was driving when the accident occurred. Maloney testified that he and Williams went out between 5 and 6 p.m. on the night in question. He' claimed that they went to the Stop-N-Go, where Williams went inside and bought them some beer. They then went to visit a series of three friends at their houses. Williams drank two quarts of beer before 10 p.m., while Maloney drank one quart of beer, which he finished by 9 p.m. Maloney said this was the last beer he had that evening. Maloney testified that they went to get more beer for Williams around 10 p.m., but he could not recall if it was a six-pack or two or three cans. They then went to the Mill and hung out in the parking lot until 11:30 p.m. While there, Williams drank the rest of his beer. Malo-ney claims that he never even got out of the car. They decided to go home about 11:30 p.m. Williams pulled out of the parking lot and headed toward home. Maloney thought Williams was fine and was able to drive. When they started going into a curve, less than a quarter of a mile from the Mill, Williams failed to decelerate. Maloney started to say something, and the next thing he remembers is coming to after the accident. Williams was sitting up against him, but was not sitting in Malo-ney’s seat. Williams’ head was back behind Maloney’s head. Maloney eased out from underneath Williams and climbed out of the window on the passenger side.
The defense also presented evidence directed at the contention that clerks at the Shop-N-Go had willfully and routinely sold alcohol to minors. Three members of the Kwak family testified that none of them remembered selling alcoholic beverages to either Williams or Maloney. The store policy was to card anyone who appeared younger than twenty-five-years old,
As part of its case, the defense also offered the depositions of several physicians tending to show that Williams had made a complete recovery following the accident. Dr. Robert testified that he treated Williams beginning on August 17, 1993, when Williams was transferred to the BIRC unit. Williams had two main injuries. The first was an injury to the cervical spine, which was treated with a halo due to the cervical fracture. The second was a brain injury. The brain injury was a mild diffuse axonal injury, which is an injury which occurs in a high-speed accident when the head moves back and forward very fast. Dr. Robert testified that these types of brain injuries typically heal over time. In this case, they performed a cranial tomography on Williams on January 23, 1994, which showed that his brain had returned to normal. Dr. Robert saw Williams again on August 24, 1994, nearly a year after the accident. He thought that he had made a good recovery. He was unable to see any significant cognitive problems during his examination and, in fact, found no abnormalities. He last saw him on December 28, 1994, at which time he indicated that Williams had an “overall excellent recovery.” However, he testified that with injuries like this they are reluctant to say that someone has made a full recovery or is “fully back to normal.” Dr. Robert explained that additional testing would be needed to learn more about his cognitive *419 status, but said that Williams was unable to pay for any additional testing. Dr. Robert agreed that there was a possibility that “multi-task testing” would reveal that Williams has some problems with his memory, since this can result from this type of injury. He also acknowledged that Williams had complained of some memory problems during his August 24, 1994 office visit and testified that, “Yes, I will expect that there will be some memory problems.”
The defense also presented evidence from which the jury could have determined that Williams had had attitude problems prior to the accident and had no residual work problems from the accident.
During trial, Maloney sought and was denied the opportunity to present evidence on the seat belt defense. He proffered the testimony of Joseph Arnett, an engineer, who was offered as an accident re-constructionist and an expert on seat belts. He testified on proffer that the car was going 50 miles per hour when it struck the light pole, after which it veered off going 25 miles per hour. He said that given these particulars, the greatest “speed loss” on impact was 25 miles per hour. He testified that anyone wearing a seat belt would not have sustained any physical injuries if involved in a crash at 25 miles per hour. After this testimony was proffered, Williams’ counsel asked the court to preclude the testimony, as well as Maloney’s use of the seat belt defense. Williams’ counsel theorized that the defense was inapplicable because there was no evidence that Williams made a conscious decision not to wear a seat belt. Maloney’s counsel argued that the testimony should be allowed because there was evidence that Williams was driving at the time of the accident. After listening to argument, the court found that defendant was not entitled to an instruction on the seat-belt defense and decided to exclude Arnett’s testimony. The court explained that its decision was based on Maloney’s failure to lay a proper predicate for assertion of the defense. The court reasoned:
I think the controlling case would be the Fifth District Court of Appeals case of State Farm Mutual Automobile Company against Smith which states among other things that non-use of the seat belt may or may not amount to failure to use reasonable care on the part of the plaintiff. Whether it does or not depends on the particular circumstances of the case. Defendant has a burden of pleading and proving that the plaintiff did not use an available and operational seat bet, that the plaintiffs failure to use the seat belt was unreasonable under the circumstances.
Well, this case dictates that they were both drunk out of their mind, or was at least drinking heavily and that there was a causal relationship between the injuries sustained by the plaintiff and the plaintiffs failure to buckle up.
So based on the prevailing law in the Fifth I’m not going to give the instruction on the seat belt defense. Y’all can argue to the jury whatever you want to on it.
After deliberations, the jury returned a verdict in favor of Williams in the amount of $439,617.10, which was comprised of the following damages: (1) $69,617.10 in past medical and hospital expenses; (2) $20,000 in future medical expenses, reduced to their present value; (3) $150,000 for past pain and suffering; and (4) $200,000 for future pain and suffering.
Maloney contends on appeal that the trial court erred by refusing to permit him to introduce evidence that Williams’ injuries were exacerbated because of his failure to wear a seat belt.[4] He argues *420 that the exclusion of evidence on the seat belt defense entitles him to a new trial.
Williams urges that the issue was properly removed from the jury because if the jury had found that he was driving when the accident occurred, he would have been 100% at fault and would have had no right of recovery. He further contends that in the event the jury found that Maloney was driving (which is apparently what the jury concluded), his own failure to wear a seat belt could not have been used to-reduce his damages, since the uncontroverted testimony was that he was unconscious when the car was put in motion.
Both parties cite Bonds v. Fleming, 539 So.2d 583 (Fla. 5th DCA 1989), which involves a factual situation similar to the instant case. Bonds involved an automobile accident which occurred after Fleming, an adult, procured alcoholic beverages for Bonds, a minor. The adult was driving Bonds’ vehicle when the accident occurred, and Bonds was not wearing his seat belt. Bonds brought suit against the adult, who answered with the seat belt defense. Bonds replied as an avoidance that the defense was inapplicable since he was unconscious when the accident occurred, due to consumption of alcoholic beverages procured by Fleming. Fleming moved for summary judgment, and the parties stipulated that Bonds would have avoided all injuries in the accident had he been wearing a seat belt. On appeal, the issue before this court was “whether the driver of an automobile has a legal duty to ascertain that his inebriated passenger is secured by a seat belt and, if not, whether such a driver should, nonetheless, be estopped from relying upon the affirmative seat belt defense.” Id. at 584. This court answered both questions in the negative. The court explained that although Bonds was a minor, he was held to an adult standard of care in regard to use of a seat belt. It further explained that “Bonds should have know his voluntary inebriation would diminish his appreciation for automobile safety measures including a seat belt.” Id. at 585. This court concluded that “[a]s a matter of public policy we are not persuaded that Bonds could not have adequately protected himself from the consequences of his own voluntary inebriation where at the time he was old enough to operate a dangerous instrumentality under Florida law.” Id.
Bonds dictates the conclusion that the trial court erred in refusing to permit Ma-loney to present his seat belt defense. Williams contends that Bonds is distinguishable from the instant case because he got in the car to sleep and the car was put in motion without his knowledge or consent. Thus, his failure to buckle up cannot be used against him. This argument, however, enables Williams to take advantage of his own voluntary inebriation to avoid the standard of care established by section 316.614, Florida Statutes. This argument was rejected in Bonds, even as against an adult who had procured the alcohol, when the court concluded that “Bonds should have known that his voluntary inebriation would diminish his appreciation for automobile safety measures including the use of a seat belt.” Id. at 585. Additionally, we consider it significant that, according to Williams’ own testimony, he recovered his senses briefly when the car began to pull out of the parking lot. A jury could find that a prudent passenger who had not incapacitated himself with alcohol would have and should have protected himself by fastening his seatbelt. The court’s refusal to allow the testimony and to give the seat belt instruction was error and requires a new trial.
We also agree with Maloney that it was error to permit Williams to submit his claim for damages for his “brain injury” to the jury. Expert testimony is required to establish the existence of such an injury. *421 See Newman v. Amente, 634 So.2d 305 (Fla. 5th DCA 1994), quashed on other grounds, 653 So.2d 1030 (Fla.1995). It is also needed to prove permanency and a causal connection between the injuries sustained in the accident and the symptoms testified to by Williams and his parents.
The only expert testimony offered on any of these issues was the testimony of Dr. Robert. Dr. Robert testified that one of the two types of injuries which Williams had sustained in the accident was a “brain injury,” which resulted from his head moving backward and forward at high-speed. However, Dr. Robert testified that these types of brain injuries typically heal over time and that a cranial tomography performed on Williams on January 23, 1994 showed that his brain had returned to normal. He also testified that he saw Williams on August 24, 1994, nearly a year after the accident, and thought that he had made a good recovery. He explained that he was unable to see any significant cognitive problems during his examination and, in fact, found no abnormalities. He last saw him on December 28, 1994, at which time he indicated in his notes that Williams had had an “overall excellent recovery.” Although Dr. Robert said that with injuries like this they are reluctant to say that someone has made a full recovery or is “fully back to normal”, he made it plain that additional testing would be needed to learn more about his cognitive status. He also agreed that there was a possibility that “multi-task testing” would reveal that Williams has some problems with his memory, since this can result from this type of injury.
This testimony fails to show either permanency, or the necessary causal connection between the personality problems that Williams has allegedly experienced and the accident. Without additional evidence on these issues, these damages should not have been submitted to the jury for their consideration.
We find no merit in Maloney’s other issues on appeal.
REVERSED and REMANDED for a new trial.
COBB and PETERSON, JJ., concur.

. Maloney's mother was also named as a defendant in the action, but she was dropped from the suit at trial.

. Ultimately, it was determined that he had suffered a fractured vertebrae, possibly two, due to the accident, as well as some facial injuries.

. Actually, he appears to have gone into the hospital on August 4, 1993 and to have been discharged on August 31, 1993.

. The seat bell defense has been described as: an attempt to prove that the non-use of a functional and available restraint system by the plaintiff either caused or measurably worsened the plaintiff’s injuries that resulted from the defendant's actions, and based on that non-use (even though the non-use preceded and did not cause or contribute to *420 the accident), the plaintiffs recoverable damages should be barred or reduced.
Ridley v. Safety Kleen Corp., 693 So.2d 934, 938 (Fla.1996), citing Alvin S. Hyde, The Seat Belt Defense 5 (1985).